Leon S. Jaffee and Fern Jaffee v. Commissioner. Walter S. Ruekberg and Lois H. Ruekberg v. Commissioner.
Jaffee v. Comm'r
Docket Nos. 5171-64, 5172-64. United States Tax Court
T.C. Memo 1967-134; 1967 Tax Ct. Memo LEXIS 126; 26 T.C.M. (CCH) 602; T.C.M. (RIA) 67134; June 20, 1967
Gerald A. Gitles, for the petitioners. James E. Caldwell, for respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax for the taxable year 1960 against the petitioners Leon S. and Fern Jaffee in the amount of $5,315.91, and against the petitioners Walter S. and Lois H. Ruekberg in the amount of $3,889.57. The issue is whether the petitioners are entitled to a business bad debt deduction for 1960 on account of amounts totaling $14,100 which had been advanced by each of the petitioners Leon S. Jaffee and Walter S. Ruekberg to a corporation in which each owned a 25 percent stock interest. Findings of Fact Some of the facts have been stipulated and the stipulations are incorporated herein by this reference. The petitioners Leon *127 S. and Fern Jaffee are husband and wife residing in Glencoe, Illinois. They filed a joint Federal income tax return for the taxable year 1960 with the district director of internal revenue, Chicago, Illinois. The petitioners Walter S. and Lois H. Ruekberg are husband and wife residing in Highland Park, Illinois. They filed a joint Federal income tax return for the taxable year 1960 with the same district director. The petitioners Fern Jaffee and Lois H. Ruekberg are parties herein only by reason of having filed joint returns with their respective husbands, and Leon S. Jaffee and Walter S. Ruekberg will hereinafter be referred to as the petitioners. Jaffee has been employed by The Regensteiner Corporation, Printers, Chicago, Illinois (hereinafter referred to as Regensteiner) since 1951, and as a salesman for that company since 1954. He has never owned any stock of the company nor has he been a member of its board of directors and he is not related to any of its stockholders, directors, or officers. Ruekberg has been employed by that company since 1940 and as a salesman for the company since 1956. Since 1956 he has not been a stockholder or a member of the board of directors and is *128 not related in any way to any of the company's stockholders, directors, or officers. Neither Jaffee nor Ruckberg ever had a formal contract covering the terms of his employment as a salesman. However, the arrangement provided that the sole compensation should be from commissions on the sale of printing. Whenever Jaffee or Ruekberg obtained a new account for the sale of printing, Regensteiner made a credit check of the new customer. Credit checks were also made periodically with respect to current accounts. If Regensteiner refused, for credit reasons, to enter into a contract with a customer of either Jaffee or Ruekberg those individuals would personally guarantee the credit if, in their judgment, the risk was justified. Diversified Map Corporation (hereinafter referred to as Diversified) was incorporated on June 2, 1959. Its capital stock consisted of 100 shares of common stock with a par value of $100 per share, which was subscribed by Eugene W. Huszar and Harold C. Dethlefsen in equal amounts. The business of Diversified was the production and sale of all types of maps and charts. Its custom was to enter into contract with map users. It would perform the cartographical functions *129 of map making and then would contract with a printing concern for the printing of the maps required by its customers. In early 1960 Jaffee entered into negotiations with Huszar, president of Diversified, for the purpose of obtaining orders for the printing of maps. On February 2 he submitted a bid of $9,585 for one printing job, and on March 10 he submitted a bid on a second printing job totaling $105,200. Jaffee did not receive any printing orders as a result of these bids. Huszar told Jaffee that he was having some difficulty with the other stockholder, Dethlefsen, and that it was questionable whether the business could continue unless Dethlefsen's stock interest could be purchased. Jaffee recognized this situation as an opportunity for him to acquire a "captive" printing account. Accordingly, he discussed with Huszar the possibility of his purchasing Dethlefsen's interest for that purpose. Dethlefsen was a guarantor on certain promissory notes held by a bank for advances made by the bank to Diversified. Jaffee learned that in order to obtain Dethlefsen's stock he would be required to replace Dethlefsen as guarantor on such notes. However, the bank regarded Jaffee's financial *130 position as inadequate. Thereupon, Jaffee suggested to Ruekberg, who had financial resources sufficient to satisfy the bank, that each of them purchase one-half of Dethlefsen's stock and that each receive one-half of any commissions from printing orders obtained by them from Diversified. In March 1960 Jaffee and Ruekberg had further conversations and meetings with Huszar who supplied them with information concerning the financial condition and prospects of Diversified. Huszar informed them that Diversified had contracts with the Federal government for maps, some of which were in process, and other contracts for encyclopedia maps, and told them that there were current negotiations with an oil company for a new type of road map which Huszar had conceived, based upon the new Federal interstate highway system. He advised them that the total projected gross income from all of these sources was about $148,000. Of the total projected gross income of about $148,000, about $88,000 would represent the sale of maps which would require printing work. Huszar also informed the petitioners that the company would need additional funds to be used as working capital over a period of several months. *131 Based upon the information thus furnished, and upon his personal examination of the books and records of Diversified, Ruekberg made a projection of income, expenses, and profit potential for the 10-month period from March to December 1960 to determine whether it was advisable to purchase the stock in order to obtain the printing and to determine whether the company was solvent. Such projection showed that there would be needed in such period cash of about $118,000, of which $9,535.54 was to meet immediate needs. Such projection showed expected revenue of approximately $148,000, and Ruekberg therefore concluded that the company would earn a profit during that period. On April 12, 1960, Jaffee and Ruekberg each acquired one-half of the stock in Diversified, each paying to Dethlefsen $2,500. On the same date Jaffe and Ruekberg became guarantors of loans totaling $36,793.35 which Diversified owed to the bank. During the taxable year 1960 Jaffee and Ruekberg each made advances to Diversified in amounts as follows for the purpose of paying current accounts payable: April 12, 1960
$ 6,500
April 23, 1960
1,000
June 16, 1960
1,000
June 24, 1960
2,000
July 1, 1960
2,000
July 8, 1960
1,000
July 22, 1960
200
August 15, 1960
400
Total (each)
$14,100
*132 Jaffee and Ruekberg each received promissory notes totaling $14,100 signed by Huszar in his capacity as president of Diversified, which were due one year later with interest at 5 percent. Neither Jaffee nor Ruekberg had an office at Diversified and neither took an active part in the internal affairs and management of Diversified. Huszar, as president, was paid a salary of $210 per week. On or about July 18, 1960, an accounting firm delivered to Jaffee and Ruekberg a balance sheet of Diversified as of May 31, 1960, and a statement of income of Diversified. The balance sheet showed total assets of $56,611.66, total liabilities of $107,060.27 (including officers' notes payable of $15,250, of which $15,000 was due the petitioners), and "Stockholders' Equity (Deficit)" of $50,448.61. The statement showed sales for the period January 1 to May 31, 1960 of $24,931.75, cost of sales of $54,878.25, operating expenses of $28,841.26, depreciation of $1,660.85, and a net loss of $60,448.61. [1]
*133 After receiving the above report from the accounting firm, Jaffee and Ruekberg became concerned about the operations of Diversified. In the fall of 1960 they recognized that Diversified was not meeting its commitments on its contracts. They had talks with Huszar who advised them that the United States Air Force intended to terminate portions of its contracts with Diversified, and they verified this information by contacting the Air Force directly. In the fall of 1960 William R. Rivkin, attorney for the petitioners, advised them to dispose of their interest in the corporation and limit their loss. Accordingly, on November 25, 1960, the petitioners addressed a letter to Huszar in which each proposed to surrender his notes to Diversified, resign as an officer and director of the corporation, sell his stock interest in the company to Huszar or his nominee for the sum of $1, and cause the bank to renew Diversified's notes aggregating $42,084. The proposal was conditioned upon Huszar's agreement to do, or cause to be done, a number of things on or before December 1, 1960, including payment of the bank loan by March 1, 1961, and in any event to "indemnify each of us from any and all liability *134 with respect thereof"; to pay the Internal Revenue Service an amount of $3,510.14 on account of social security and withholding taxes for the first quarter of 1960; and to "indemnify us against any and all claims which might be asserted by virtue of the second and fourth quarters of 1960 with respect to such taxes." The proposal further provided that Huszar's undertaking under the agreement should be guaranteed by his mother and by any third party who might become an equity owner in Diversified. The proposal was accepted by Huszar and in early December 1960 Rivkin, acting as escrow agent, received from the petitioners the promissory notes aggregating $28,200 and their stock certificates aggregating 50 shares. Rivkin receievd on or about December 7 a check for $1 payable to Jaffee and one in the same amount payable to Ruekberg, and evidence that Huszar had complied with all other conditions except those pertaining to the payment of social security and withholding taxes. Huszar did not furnish an indemnity agreement with respect thereto and it was not until about February 14, 1961, that he furnished Rivkin evidence of payment of such taxes. Thereupon Rivkin immediately forwarded to *135 Huszar the endorsed stock certificates and the promissory notes aggregating $28,200. In his return for the taxable year 1960 the petitioner Ruekberg reported a long-term capital loss of $2,499 on the sale or exchange of his Diversified stock and claimed that amount as an offset against reported capital gains. In his return for that year the petitioner Jaffee reported a long-term capital loss on his stock in the amount of $2,500 and claimed a deduction on account thereof to the extent of $1,000. The respondent made no adjustments in these respects. In their returns for 1960, in computing adjusted gross income, Jaffee and Ruekberg each claimed a bad debt deduction of $14,100 on account of the notes under the heading of "Outside Salesman's Expenses." The respondent disallowed these claimed deductions, determining that the claimed losses should be treated as capital losses. In the case of Jaffee he determined that no part of the $14,100 was deductible since Jaffee had reported no capital gains and had been allowed a deduction on account of his stock loss to the extent of $1,000. In the case of Ruekberg he determined that the loss of $14,100 was deductible to the extent of $1,772.08 because *136 of capital gains which had been reported. The notice of deficiency mailed to the Jaffees contains the following statement (which is similar to the statement contained in the notice of deficiency mailed to the Ruekbergs): (a) The deduction of $14,100.00 claimed as a business bad debt resulting from advances in that amount to the Diversified Map Corporation is disallowed. It is determined that such advances constituted contributions to capital of Diversified Map Corporation. Since the shares of capital stock of the Diversified Map Corporation which you owned were sold or became worthless within the taxable year and are capital assets, a capital loss was incurred. * * * In the alternative, it is determined that you sustained a nonbusiness bad debt loss of $14,100.00 resulting from advances to the Diversified Map Corporation. Since such nonbusiness bad debt became worthless within the taxable year, such loss is to be treated as a capital loss. * * * The advances made by the petitioners to Diversified constituted bona fide loans. Opinion For the taxable year 1960 each of the petitioners Jaffee and Ruekberg reported a long-term capital loss with respect to his $2,500 investment *137 in the stock of Diversified and claimed deductions on account thereof in the respective amounts of $1,000 and $2,499. The respondent allowed those deductions and they are not in question herein. The deduction in controversy in the case of each petitioner is the amount of $14,100, which each advanced to the corporation and claimed as a business bad debt deduction under section 166 of the Internal Revenue Code of 1954. [2]
*138 The respondent's primary determination in the notices of deficiency was that the advances constituted contributions to the capital of Diversified, rather than loans, and that since the petitioners' stock in Diversified constituted capital assets which were sold or became worthless within the taxable year, the amounts advanced also constituted capital losses as a part of the cost of the stock. In the notices of deficiency he determined, in the alternative, that the amounts advanced constituted nonbusiness debts which became worthless in the taxable year and that therefore the loss thereon is to be treated as a capital loss. The question whether an advance made to a corporation by a stockholder constitutes a contribution of capital or a loan is one of fact. Cohen v. Commissioner, (C.A. 2) 148 F. 2d 336, affirming a Memorandum Opinion of this Court. No single factor is determinative, and the question is to be determined upon the basis of all the facts and circumstances, including the intention of the parties. John Kelley Company v. Commissioner, 326 U.S. 521; Milwaukee & Suburban Transport Corporation v. Commissioner, (C.A. 7) 283 F. 2d 279, *139 affirming on this issue a Memorandum Opinion of this Court, certiorari denied 368 U.S. 976; and Wilbur Security Company v. Commissioner, (C.A. 9) 279 F. 2d 657, affirming 31 T.C. 938. From a consideration of the whole record, we have concluded and have found as a fact that the advances in question constituted bona fide loans. We are also satisfied from the record that the debts were created in connection with the petitioners' trade or business within the contemplation of section 166 of the Code. Such trade or business was that of salesman for a printing company, the compensation from which consisted solely of commissions upon orders for printing which they obtained. Their transactions with Diversified arose from initial attempts of petitioner Jaffee to obtain from that company orders for the printing of maps in the total amount of about $115,000. It was doubtful whether the corporation could continue in business unless the stock of Dethlefsen, owner of 50 percent of the stock of Diversified, could be purchased. The petitioners purchased the stock of Dethlefsen in order to obtain a "captive" printing account, the understanding between them being *140 that they would share equally the commissions derived from such account. The corporation was in need of funds to be used as working capital for a period of several months. Accordingly, each of the petitioners advanced $14,100, evidenced by interest-bearing notes, payable one year after issue. It is clear that the petitioners and Huszar, president of the corporation, considered the amounts as loans, and they were treated as such on the books of the corporation. The petitioners were accustomed to guaranteeing the credit of prospective customers when their employer considered the accounts risky, and we see no essential difference between that practice and the course which they pursued in this particular case. We note that Huszar, who owned the remaining 50 percent of the stock of Diversified, did not make similar advances to the corporation, as would seem probable if the advances had been intended as contributions to the capital of the corporation. There is no circumstance obtaining here which establishes that the advances were other than what they purported to be, namely, interest-bearing loans repayable at a date certain. We have carefully considered the respondent's contention that *141 at the time the advances were made there was no reasonable prospect of repayment, that the loans were worthless when made, and that therefore such advances must be considered as equity investment instead of loans. While it is true that the corporation was in need of working capital, the need appeared to be for a relatively short period. The corporation had contracts or prospective contracts which it was anticipated would yield about $148,000 of income. Before making the advances the petitioners made a projection which indicated that expenditures would amount to about $118,000, and that a profit of approximately $30,000 would be realized for the year 1960. In view of these prospects it was reasonable to conclude that the loans would be repaid at maturity. Since the loans were made in order to enable Diversified to fulfill orders for maps, which would entail printing work upon which the petitioners would receive commissions, we think it clear that the loans were made in connection with the trade or business of the petitioners, and therefore constituted business debts. The fact that each of the petitioners was a minority stockholder in Diversified, and as such had an added incentive *142 to make it successful, does not prevent the debts from being business rather than nonbusiness debts. Stuart Bart, 21 T.C. 880. On brief the respondent for the first time advances the contention that the debts did not become worthless in the taxable year 1960 and are hence not deductible. This contention, however, is completely inconsistent with the determinations made in the notices of deficiency. In such notices it was specifically stated in connection with the alternative contention that the debts became worthless in 1960, but that since they were nonbusiness bad debts the losses were to be treated as capital losses, the deductibility of which is limited by statute. His determination in the case of the Ruekbergs resulted in the allowance of a portion of the loss since they had reported capital gains. His present contention, if sustained, would lead to the disallowance of any deduction whatsoever. The respondent did not raise this question in his answer. Under the circumstances, we think such question now presented by the respondent is not in issue. It may be added, however, that evidence was presented which we think establishes that the debts did become worthless *143 in 1960. In view of the fact that Diversified's receipts declined drastically after June 1, 1960, and the fact that cancellation of some of its contracts was imminent, it is apparent that in the latter part of 1960 there was no reasonable prospect that the debts would be paid. We hold that the petitioners are entitled to deduct the amounts claimed as business bad debts for the taxable year 1960. [3] In view of this holding, it is unnecessary to consider the further contention advanced by the petitioners that even if the advances constituted contributions to the capital of Diversified, such contributions were not made as an investment but in furtherance of their own trade or business and that, under authority of such cases as Tulane Hardwood Lumber Co., 24 T.C. 1146, and Hagan v. United States, (W.D. Ark.) 221 F. Supp. 248, the amounts in question are deductible as ordinary and necessary business expenses or losses incurred in their trade or business. *144 Decisions will be entered under Rule 50. Footnotes
1. On or about January 31, 1963, the same accounting firm delivered a balance sheet of the company as of August 22, 1960 and a statement of income for the period June 1 to August 22, 1960. The balance sheet showed "Stockholders' Equity (Deficit)" of $68,054.86. Among liabilities were officers' notes payable of $29,567.07, of which $28,200 was due the petitioners. The statement showed sales of $2,077 for the period May 31 to August 22, 1960, cost of sales of $15,472.12, operating expenses of $3,395.69, depreciation of $815.44, and a net loss of $17,606.25.↩
2. Sec. 166 of the Internal Revenue Code of 1954 provides in part: (a) General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts. - When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * *
(d) Nonbusiness Debts. - (1) General Rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a taxpayer's trade or business: or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
3. It may be pointed out that, as provided in section 1.166-1(c) of the Income Tax Regulations↩, the fact that a debt is not due at the time of deduction does not of itself prevent its allowance.