ROBERT H. AND YVONNE C. BROOKS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Brooks v. Commissioner
Docket No. 24893-88
United States Tax Court
T.C. Memo 1990-259; 1990 Tax Ct. Memo LEXIS 278; 59 T.C.M. (CCH) 682; T.C.M. (RIA) 90259; May 29, 1990, Filed Petitioner was the majority shareholder and president of Corporation E. Corporation E was dependent upon sales to two major customers with whom it had no purchasing agreements. In order to reduce Corporation E's dependence on those customers, petitioner formed Corporation M which petitioner caused to acquire a chain of restaurants and become a captive customer of Corporation E. Petitioner guaranteed the promissory notes Corporation M issued in connection with the purchase of the restaurant chain. Corporation M was not successful and petitioner made payments on the notes as guarantor. Held: Petitioner's dominant motivation for guaranteeing the obligations of Corporation M was to preserve his investment in Corporation E rather than to protect his business of being an employee of Corporation E. Held further: Petitioner's payment as guarantor gave rise to a loss attributable to a nonbusiness bad debt, deductible as a short-term capital loss pursuant to section 166(d). Held further: Petitioners are liable for the addition to tax for a substantial understatement of income tax pursuant to section 6661. Gary E. Snyder and Russell P. Love, *279 for the petitioners.
Mark S. Mesler, for the respondent. WHITAKER, Judge. WHITAKER
*940 MEMORANDUM FINDINGS OF FACT AND OPINION By statutory notice dated June 24, 1988, respondent determined a deficiency in petitioners' 1983 Federal income tax in the amount of $ 26,025 and an addition to tax for a substantial understatement of income tax in the amount of $ 6,506.25. The issues for decision are: (1) whether a payment made in 1983 pursuant to a personal guarantee of corporate obligations gave rise to a business bad debt, deductible under the provisions of section *941 166(a), [1] or gave rise to a nonbusiness bad debt, deductible under the provisions of section 166(d); and (2) whether petitioners are liable for an addition to tax for a substantial understatement of income tax pursuant to section 6661. FINDINGS OF FACT Some of the facts are stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated by this reference. Petitioners resided in *280 Fayetteville, Georgia, at the time of filing their petition in this case. All references to petitioner in the singular are to Robert H. Brooks. Beginning several years prior to 1974 and continuing through the date of trial, petitioner was the president and majority shareholder of Eastern Foods, Inc. ("Eastern"). Petitioner owned 63 percent of the outstanding stock of Eastern. The remaining shares were owned by William R. Bellamy, who was vice president of Eastern. Stockholders' equity in Eastern at the end of Eastern's fiscal year on November 30, 1974, amounted to $ 526,741. Thus, the value of petitioner's 63-percent investment in Eastern on November 30, 1974, amounted to $ 331,846.83. Petitioner received an annual compensation package from Eastern which consisted of a base salary and a bonus. The bonus was dependent upon, and computed according to, Eastern's annual profits. When Eastern had large annual profits, petitioner received a large bonus. On the other hand, when Eastern's annual profits were small, petitioner received a proportionately smaller bonus. Petitioner received a base salary from Eastern in 1974 amounting to $ 52,350, but received no bonus in that year. [2] In *281 addition to compensation from Eastern, petitioners reported income of $ 9,000 from unspecified director's fees and a small amount of income from capital gain in 1974. In 1983, petitioner received a base salary from Eastern which amounted to $ 78,000. Petitioner received a bonus from Eastern in 1983 in the amount of $ 217,300. Petitioner's dual status as majority shareholder and as senior officer of Eastern was one of the reasons for the generous compensation package. It is doubtful that petitioner could have obtained an equivalent compensation plan from another employer. At all times relevant to this case, Eastern manufactured and distributed salad dressings, syrups, and sauces for sale in the food service industry. During the 1960's and early 1970's, Eastern's customer base consisted primarily of two customers, the Red Lobster and the Waffle House restaurant chains ("Red Lobster" and "Waffle House," respectively). Eastern's business grew in direct relationship to the expansion of Red Lobster and Waffle House throughout the South and Midwest. *282 As Red Lobster or Waffle House opened or acquired new restaurants, Eastern increased manufacturing and expanded distribution in order to meet the growing needs of those organizations. During 1974, sales to Red Lobster and Waffle House comprised 90 to 95 percent of Eastern's business, with sales to Red Lobster constituting 60 to 65 percent of the aggregate sales to the two organizations. Eastern had gross sales amounting to $ 6,692,076 in 1974, of which approximately $ 6,000,000 in sales were attributable to Red Lobster and Waffle House. Primarily because of expenses attributable to servicing Red Lobster and Waffle House restaurants located in diverse geographic locations, Eastern had a net taxable income in 1974 amounting to only $ 169,047. Eastern had no contract or agreement with either Red Lobster or Waffle House with respect to the purchase of Eastern's products. Because those two organizations provided virtually all of Eastern's business during the early 1970's, petitioner feared that loss of either customer at that time could cripple or destroy Eastern. It was deemed prudent to expand the number of Eastern's customers to lessen the company's reliance on Red Lobster and *283 Waffle House. Petitioner determined that the best method of providing a broader customer base for Eastern would be for Eastern to acquire a customer who would have no choice but to purchase products from Eastern, i.e., a captive customer. Sometime during 1974, petitioner, Mr. Bellamy, and Charlie Jones formed a plan to purchase Hasty House Restaurants, Inc. ("Hasty House"). The purpose behind the plan was to acquire a chain of restaurants which would become the captive customer of Eastern. Although Eastern had a moderate amount of retained earnings in 1974, the corporation could not afford the cost of such an acquisition at that time because of its high operating costs. For purposes of the acquisition, petitioner organized McWaffles, Inc. ("McWaffles") in December 1974. Petitioner contributed $ 50,000 in cash to the capital of McWaffles and acquired 66.667 percent of the stock of McWaffles. Mr. Bellamy and Mr. Jones contributed $ 20,000 and $ 5,000, respectively, thereby acquiring 26.667 percent and 6.667 percent of McWaffles' stock. Prior to purchase by McWaffles, Hasty House owned three subsidiary corporations which owned and operated restaurants located in several cities in *284 Georgia and Florida. The Hasty *942 House restaurants were located in the same geographic areas as Red Lobster and Waffle House restaurants served by Eastern and required the type of products which Eastern manufactured and distributed. Without a buy out, it was doubtful that Hasty House would have purchased Eastern's products because Hasty House also owned and operated a commissary producing food products for its restaurants. However, a good possibility existed that McWaffles, as a captive customer owning the former Hasty House restaurants, would partially counteract Eastern's dependence on Red Lobster and Waffle House while causing no significant increase in Eastern's operating costs. In January 1975 McWaffles bought all of the stock of Hasty House for $ 800,000. Pursuant to the terms of the purchase agreement, $ 232,000 of the purchase price was paid in cash at or soon after the time of closing. McWaffles provided a minimal amount of that cash out of its capital. The remaining cash came from cash assets of Hasty House which McWaffles acquired in the purchase. McWaffles issued 10-year promissory notes to each of the former Hasty House shareholders for the remainder of the purchase *285 price. The total of the principal amounts of all the notes equaled $ 568,000. As part of the written purchase agreement, petitioner personally guaranteed all of the promissory notes. Petitioner had not previously guaranteed the debt of one of Eastern's customers. Without petitioner's guarantee the former shareholders of Hasty House would not have sold the company to McWaffles. Immediately prior to the purchase Hasty House was in good financial condition. Petitioner and the other shareholders of McWaffles obtained sets of 1-, 2-, 3-, and 5-year projections of expected income from the operation of the business. One income projection was predicated upon the hypothesis that McWaffles would conduct the business using the existing assets and operating in the same manner as had Hasty House. Another projected income in the event that McWaffles changed menus and expanded the number of restaurants after purchase. Both projections indicated that McWaffles' future income should have been sufficient to enable McWaffles to meet its obligations to the former Hasty House shareholders. In light of the income projections and because of the positive financial condition of Hasty House prior to *286 purchase, petitioner did not anticipate that he would ever be called upon to satisfy his obligation as guarantor of McWaffles' promissory notes. Promptly after acquisition, McWaffles shut down the commissary formerly owned and operated by Hasty House and began purchasing products manufactured and distributed by Eastern. Between 1975 and 1980, sales to McWaffles accounted for 5 to 10 percent of Eastern's total business. During that time period, McWaffles acquired or opened several additional restaurants. Petitioner managed and directed some of the operations of McWaffles but did not receive a salary in exchange for his services to the company. McWaffles did not achieve the success envisioned by petitioner and the other shareholders. It is unclear from the record whether the corporation was liquidated; however McWaffles ceased operations in 1980. Sometime after 1980, either Eastern or petitioner bought a second chain of restaurants to use as a captive customer for Eastern's products. Subsequent to purchase of the second chain of restaurants, Eastern lost one of its major customers. Eastern was not crippled or destroyed by such loss of sales, although its profits were significantly *287 impacted by the concomitant loss of approximately one-half its business. Eastern's stability was due in part to business generated from the second restaurant chain. The first payments on the promissory notes to the former Hasty House shareholders came due in 1976. McWaffles made some early payments on the notes. However, presumably because McWaffles soon found itself in a poor financial position, petitioner began making payments of both principal and interest on the notes in 1976. [3] Petitioner continued making payments on the notes at least through 1983, the year in issue. On joint Federal income tax returns for the years 1976 through 1982, petitioner's payments on the promissory notes were treated as nonbusiness bad debts and reported as short-term capital losses. By 1983 petitioners had accumulated a capital loss carryover amounting to $ 259,000. Petitioner left preparation of his joint income tax returns for 1976 through 1982 entirely in the hands of an accountant and was unaware that the note payments were treated as short-term capital losses in those years. Petitioner assumed that the payments were treated as business bad debts and claimed as ordinary losses in those years. *288 In 1983, petitioner paid the former Hasty House shareholders $ 56,088 on the notes. Petitioner had no capital gains in that year which could have offset capital losses. Petitioner *943 changed accountants sometime before preparation of his joint income tax return for 1983. The new accountant, Sean Meehan, prepared the joint return for that year so that petitioner's 1983 payment was treated as a business bad debt and the amount of the payment was claimed as ordinary loss. Mr. Meehan advised petitioner of the change in treatment, suggesting that petitioner was *289 entitled to the greater deduction. Petitioner agreed with the change in treatment of the note payments. OPINION In the years from 1976 through 1982, petitioners treated payments made as guarantor of promissory notes issued by McWaffles as nonbusiness bad debts and deducted such amounts as short-term capital losses. Petitioners claim, however, that the payment made in 1983 should be treated as a business bad debt, deductible as an ordinary loss pursuant to section 166(a). Petitioners assert that the guarantee of the debt of McWaffles was made in order to protect or preserve employment with Eastern. Respondent argues to the contrary that the 1983 payment is deductible only as a nonbusiness bad debt, consistent with treatment by petitioners of such payments in prior years, under the provisions of section 166(d). Before addressing the central arguments of the parties, we must first determine that a deductible bad debt existed. Losses sustained as a result of discharging liability as a guarantor of corporate obligations may, in some cases, be deductible as business bad debts or as nonbusiness bad debts. Sec. 1.166-8, Income Tax Regs. However, no treatment as a worthless debt is allowed *290 with respect to a payment made by a taxpayer in discharge of an obligation as a guarantor of corporate obligations if, on the basis of the facts and circumstances as of the time of the creation of the such obligation, the payment constitutes a contribution to capital by a shareholder. Sec. 1.166-9(c), Income Tax Regs.; [4]In re Lane, 742 F.2d 1311, 1320 (11th Cir. 1984); Casco Bank & Trust Co. v. United States, 544 F.2d 528, 534-535 (1st Cir. 1976), cert. denied 430 U.S. 907 (1977); Santa Anita Consolidated Inc. v. Commissioner, 50 T.C. 536, 550 (1968). The statutory notice disallowed petitioner's business bad debt deduction *291 on the basis that petitioner's 1975 guarantee constituted a contribution to capital. However, the parties stipulated, and thus respondent conceded, that the issue in this case was whether petitioner was entitled to a business bad debt deduction or to a nonbusiness bad debt deduction. Payments made by guarantors of corporate obligations in discharge of their guarantor's liability generally create debt which runs from the principal debtor to the guarantor. Putman v. Commissioner, 352 U.S. 82, 85 (1956); In re Lane, supra at 1319-1320 (holding that Putman does not preclude disallowing a bad debt deduction if a guarantee is in fact a capital contribution); Benak v. Commissioner, 77 T.C. 1213, 1218 (1981). Such a debt, however, is not new debt. The guarantor steps into the shoes of the original creditor and becomes subrogated to the creditor's rights against the debtor. Thus, a guarantor obtains a claim against the principal debtor when making a payment as a guarantor. Putman v. Commissioner, supra at 85; Benak v. Commissioner, supra at 1218; Crown v. Commissioner, 77 T.C. 582, 597 (1981). Georgia law agrees. See Ga. Code Ann. sec. 10-7-41 (1982). When a guarantor is unable to recover *292 on the claim against the principal debtor, the guarantor sustains a bad debt loss which is deductible under the provisions of section 166. Putman v. Commissioner, supra at 85-86; Benak v. Commissioner, supra at 1218; Crown v. Commissioner, supra at 597. Petitioner obtained a worthless claim against McWaffles when he made payment to the former Hasty House shareholders in discharge of his liability as guarantor. Having determined that petitioner sustained a deductible bad debt loss, we now address the central issue presented by the parties, i.e., which subsection of section 166 governs deductibility in the present case. Generally, section 166(a) provides that worthless bad debts may be deducted as ordinary losses. However, the nonbusiness bad debts of taxpayers other than corporations are deductible only as short-term capital losses subject to the limitations of sections 1211 and 1212. Sec. 166(d)(1)(A) and (B); sec. 1.166-5(a)(2), Income Tax Regs. A nonbusiness bad debt is a debt other than a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer or a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or *293 business. Sec. 166(d)(2)(A) and (B). This is a question of fact, the resolution of which depends upon whether the debt is "proximately" related to the trade or business of the taxpayer. Sec. 1.166-5(b)(2), Income Tax Regs.; Imel v. Commissioner, 61 T.C. 318, 323 (1973). *944 The worthless bad debts of noncorporate taxpayers which are created as a result of discharging liability as a guarantor of corporate obligations are generally deductible as nonbusiness bad debts. However, if such guarantee of corporate obligations is made in connection with the guarantor's trade or business, losses attributable to payments in satisfaction of the guarantee are deemed business bad debts and deductible as ordinary losses pursuant to section 166(a). Sec. 1.166-8(b), Income Tax Regs.
Petitioner was the president of Eastern and spent most of his time working in that activity. Accordingly, we find that petitioner was in the trade or business of being an employee of Eastern. Primuth v. Commissioner, 54 T.C. 374 (1970). It is well established that the trade or business of being an employee qualifies as a trade or business for purposes of section 166. Putoma Corp. v. Commissioner, 66 T.C. 652, 673 (1976), *294 affd. 601 F.2d 734 (5th Cir. 1979). However, petitioner was concurrently the majority shareholder in Eastern. In such circumstances, we must determine whether the bad debt in issue had a "proximate" relation to petitioner's trade or business of being an employee or was proximately related to his investment interest as a shareholder. United States v. Generes, 405 U.S. 93, 103 (1972); Benak v. Commissioner, supra at 1217; Shinefeld v. Commissioner, 65 T.C. 1092, 1096 (1976). The proper measure of whether a bad debt has a proximate relation to a taxpayer's trade or business is the dominant motivation of the taxpayer in undertaking the obligation. United States v. Generes, supra at 103; Scifo v. Commissioner, 68 T.C. 714, 723 (1977); Shinefeld v. Commissioner, supra at 1096. It is not necessary that protection of employment be the sole motivation. However, the fact that a loan or a guarantee is made in furtherance of an employer's trade or business does not mean that such loan or guarantee is proximately related to the trade or business of the employee. Benak v. Commissioner, supra at 1217; Shinefeld v. Commissioner, supra at 1098; Imel v. Commissioner, supra at 324. The taxpayer bears *295 the burden of proving his or her dominant motivation in making the guarantee was to protect employment rather than to protect or preserve investments. Rule 142(a); Benak v. Commissioner , supra at 1212; Smith v. Commissioner, 60 T.C. 316, 318 (1973). Resolution of the present case turns on the objective facts and circumstances at the time petitioner entered into the guarantee. In determining the dominant motivation of a taxpayer who is both employee and shareholder the trier of fact must "compare the risk against the potential reward and give proper emphasis to the objective rather than to the subjective." United States v. Generes, supra at 104. Motivation is determined as of the date upon which the taxpayer made the guarantee rather than the date upon which a payment in discharge of liability as guarantor is made. Stoody v. Commissioner, 66 T.C. 710 (1976). Factors which we consider in making this determination include: (1) The size of the taxpayer's investment in his employer corporation; (2) the size of the salary received by the taxpayer from the employer corporation; (3) other sources of gross income available to the taxpayer; (4) the ability of the employer corporation to *296 remain in business absent the taxpayer's guarantee; and (5) the degree to which the taxpayer's employment is protected by his or her equity position in the employer corporation. See, e.g., United States v. Generes, supra; Benak v. Commissioner, 77 T.C. 1213, 1218 (1981); Scifo v. Commissioner, supra; Shinefeld v. Commissioner, supra; Short v. Commissioner, T.C. Memo. 1986-360. Petitioner testified that his dominant motivation in making the guarantee was to protect his employment with Eastern and that his employment as president of Eastern was conditioned on Eastern's financial well-being. Petitioner further testified that he made the guarantee to prevent the possibility of loss of employment with Eastern. Petitioner's statements with respect to his dominant motivation in making the guarantee are subjective in nature. Under the rule set forth in United States v. Generes, supra, we must look to objective factors rather than subjective ones. Looking at all the objective factors, we agree with respondent that petitioner's dominant motivation in guaranteeing McWaffles' notes was to protect his investment in Eastern, not to protect employment. At the time of making the guarantee in *297 January 1975 the value of petitioner's 63-percent investment in Eastern amounted to $ 331,846.83. Petitioner's compensation from Eastern as of December 31, 1974, consisted of a salary in the amount of $ 52,350. Such a large investment interest in relation to compensation suggests that petitioner's dominant motivation in making the guarantee was to protect his investment in Eastern rather than to prevent the loss of his employment. Petitioner's employment with Eastern was protected by his majority shareholder interest and control of that company. Because of that control, the only threat that petitioner could have encountered from his employment with Eastern was a possibility that Eastern could go out of business. The record shows that at the time of making the guarantee in issue, there was a possibility that Eastern might go out of business in the event of losing one of its two major customers. However, petitioner did not guarantee *945 obligations of Red Lobster or Waffle House in order to prevent Eastern's loss of either customer. Instead, petitioner guaranteed McWaffles' obligations in order to procure a third customer for Eastern and provide some indirect protection to Eastern against *298 the potential loss of Red Lobster or Waffle House. In light of petitioner's substantial investment in Eastern, we find insignificant any indirect protection to petitioner's employment resulting from addition of McWaffles to Eastern's customer base. Petitioner's employment with Eastern was not threatened by the loss of McWaffles as a customer. Petitioner testified at trial that his employment at Eastern was not dependent upon guaranteeing McWaffles' debt to the former Hasty House shareholders. Sales to McWaffles accounted for only 5 to 10 percent of Eastern's total sales. Thus, we are not presented with a situation in which Eastern would not have had adequate income to compensate petitioner without the revenue obtained from McWaffles. See Halle v. Commissioner, T.C. Memo. 1983-760. In confirmation of our decision, we may take cognizance of subsequent events. Cf. Crown v. Commissioner, 77 T.C. 582, 582 (1981) ( subsequent events examined to confirm in which tax year a debt became worthless for purposes of section 166). Petitioner remained president of Eastern up through the time of trial in 1989 despite Eastern's loss of sales to both McWaffles and to one of its major customers. *299 Petitioner's compensation from Eastern continued and increased after Eastern lost sales to McWaffles. In 1983, 3 years after McWaffles ceased operations, petitioner received a base salary amounting to $ 78,000 and a bonus amounting to $ 217,300 from Eastern. After the loss of McWaffles, a subsequent captive customer chain of restaurants helped defray Eastern's cost of losing one of its major customers. However, this merely supports a conclusion that petitioner's guarantee was made pursuant to a reasonable business assessment that a captive customer would be beneficial to Eastern in the event of loss of a major customer. Benefit to, or furtherance of, the business of Eastern is the result of petitioner's motivation with respect to his dual relationships with Eastern. Actions taken in order to achieve a benefit for Eastern do not tend to prove whether *946 petitioner's dominant motivation in seeking such a benefit was to preserve his investment in Eastern or to protect his employment as president. In support of their position, petitioners cite Jaffee v. Commissioner, T.C. Memo. 1967-134. Petitioners' reliance on Jaffee is misplaced because the facts in the present case are distinguishable. *300 The taxpayers in Jaffee were salesmen working on commission for a publishing corporation. The taxpayers guaranteed the debt of an unrelated corporation in order to procure a captive customer for their employer and thus generate commission income. We held that those taxpayers were entitled to deductions for business bad debts with respect to payments made in discharge of their liability as guarantors. Unlike petitioner, however, the taxpayers in Jaffee were employees, not employee/shareholders, of their employer corporation. Thus, we were not presented with the problem of differentiating between an investment-driven or an employment-driven motivation behind the taxpayers' guarantee. Further, the taxpayers in Jaffee regularly guaranteed the credit of certain customers whose credit history was unsatisfactory to the employer corporation in order to protect sales and the commissions such sales generated. Petitioner had never guaranteed a debt of a customer of Eastern prior to guaranteeing McWaffles' promissory notes. Moreover, we decided Jaffee before the Supreme Court enunciated the dominant motivation test in United States v. Generes. The present case is further distinguishable *301 from cases in which we upheld business bad debt deductions attributable to loans or advances made to a taxpayer's corporate employer for purposes of preventing the employer from going out of business.[5] In such cases the fact that the taxpayers were employed by, and relied upon income from, the corporations to which the taxpayers loaned funds as significant to our determination. To the contrary, petitioner was not an employee of the corporation whose debt he guaranteed, i.e., McWaffles, and petitioner did not depend upon income from McWaffles. Scifo v. Commissioner, 68 T.C. 714, 723 (1977). At the time of making the guarantee, the main source of petitioner's income was his salary from Eastern. In light of petitioner's dual employee/majority shareholder status, we found that petitioner would have had difficulty in obtaining similar compensation from another employer. However, in view of all other objective factors in the present case, the source of petitioner's income and the likelihood of petitioner's obtaining similar compensation elsewhere have minimal significance. Petitioner has not carried *302 his burden of proving that his dominant motivation was to protect his employment with Eastern. To the contrary, looking at objective factors, we conclude that petitioner's dominant motivation for guaranteeing the debt of McWaffles was to protect his investment in Eastern. Petitioner's 1983 payment in discharge of his liability as guarantor gave rise to a loss attributable to a nonbusiness bad debt. Such loss is deductible as a short-term capital loss pursuant to section 166(d). [6] *303 See McMonagle v. Commissioner, T.C. Memo. 1988-370 (finding a nonbusiness bad debt on similar facts). Respondent also determined that petitioners substantially understated their income tax liability and argues that petitioners should be liable for the addition to tax set forth in section 6661. Section 6661 imposes an addition to tax if there is a substantial understatement of income tax for a taxable year. A substantial understatement is one which exceeds the greater of 10 percent of the tax required to be shown on the return for the taxable year or $ 5,000. Sec. 6661(b). By either test of section 6661(b), petitioners' understatement is a substantial understatement. Thus, petitioners are liable for the section 6661 addition unless such understatement can be reduced by section 6661(b)(2)(B). For the reasons set forth below, petitioners do not qualify for a reduction of the section 6661 addition for their substantial understatement of income tax. Section 6661(b)(2)(B) *304 provides for the reduction of an understatement by that portion of the understatement not attributable to tax shelter items for which there was or is substantial authority for the taxpayer's treatment of an item, or by that portion for which the relevant facts affecting the tax treatment are adequately disclosed in the return or in a statement attached to the return. Sec. 6661(b)(2)(B)(i) and (ii). Congress authorized respondent to prescribe by revenue procedure the circumstances in which information provided on a return is adequate disclosure. Sec. 1.6661-4(c), Income Tax Regs. In Revenue Procedure 84-19, specific instances of the information necessary to constitute adequate disclosure in a return filed in 1984 are given. Rev. Proc. 84-19, 1984-1 C.B. 433. As mentioned in that revenue procedure, petitioners' notation, "BUS BAD DEBT," next to the amount of the deduction claimed on Form 4797 of their 1983 joint return is inadequate disclosure of a specific bad debt charge-off. Petitioners disclosed neither the name of the debtor nor any other relevant facts. Thus, the addition determined by respondent may be reduced only if substantial authority existed for petitioners' position *305 that the payment resulted in business bad debt. There is substantial authority for the tax treatment of an item only if the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary positions. Sec. 1.6661-3(b)(1), Income Tax Regs. A position with respect to the tax treatment of an item that is arguable but fairly unlikely to prevail in court would not satisfy the requisite standard for substantial authority. Sec. 1.6661-3(a)(2), Income Tax Regs. The weight of authorities depends on their persuasiveness and relevance as well as their source. Sec. 1.6661-3(b)(3), Income Tax Regs. In instances such as the present case, where the tax treatment of an item depends on application of a well-settled proposition of law to the facts of the case, "a case or revenue ruling having some facts in common with the tax treatment at issue would not be considered particularly relevant if the authority is materially distinguishable on its facts * * *." Sec. 1.6661-3(b)(3), Income Tax Regs.
As noted above, the present case is distinguishable on its facts from those cases in which a taxpayer was held to be entitled to a business bad debt *306 deduction because of payments made pursuant to a personal guarantee of a corporation's obligations. Accordingly, we do not find that substantial authority existed or exists for petitioner's treatment of the 1983 payment as a business bad debt. Petitioners do not qualify for a reduction of the substantial underpayment addition as provided by section 6661(b)(2)(B). Petitioners next argue that respondent computed the amount of the section 6661 addition incorrectly. Petitioners maintain that the proper amount of the addition is the amount set forth in section 6661 as in effect for the year petitioners understated their income tax, i.e., 1983. Petitioners therefore contend that the amount of the addition is 10 percent of the understatement of income tax liability rather than 25 percent as determined by respondent. Petitioners' argument is incorrect. The amount of section 6661 additions assessed after October 21, 1986, is equal to 25 percent of the amount of any underpayment attributable to such understatement. *947 Sec. 6661(a); Pallottini v. Commissioner, 90 T.C. 498, 503 (1988). Finally, we note that there is some confusion with regard to whether petitioners agreed to that portion of *307 respondent's adjustment, set forth in the notice of deficiency, pertaining to additional compensation. The statutory notice states that petitioners agreed to that portion of the deficiency attributable to respondent's adjustment for additional compensation, i.e., $ 2,447, by executing a waiver on a Form 4549. The statutory notice further states that $ 2,447 of the $ 26,025 deficiency was assessed on September 8, 1986. Petitioner therefore alleged in his petition that the amount of deficiency in dispute amounted to $ 26,025 less $ 2,447, or $ 23,578. However, respondent alleged in his answer that the "entire deficiency in the amount of $ 26,025 is in dispute." Because the parties are not in agreement as to the amount of the deficiency, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioner Yvonne Brooks was also employed by Eastern in an undisclosed capacity. Eastern paid Mrs. Brooks $ 11,869 in calendar year 1974.↩
3. Stipulation of fact no. 12 states that the notes called for payments to be made in the years from 1976 through 1985, that McWaffles made payments on the notes "in the earlier years," and that petitioner made payments in "the later years." Stipulation of fact no. 13 seems to conflict with stipulation no. 12 by stating that petitioner deducted the amount of payments made by him on the notes from 1976 through 1982 as nonbusiness bad debts. Although this discrepancy is unexplained, we are convinced that McWaffles made some payments early in the term of the notes and that petitioner made some payments on the notes starting in 1976.↩
4. Generally, section 1.166-9, Income Tax Regs., applies to payments made under guarantee agreements entered into after December 31, 1975 while section 1.166-8, Income Tax Regs., applies to guarantee agreements entered into prior to January 1, 1976. However, section 1.166-9(c), Income Tax Regs., is expressly applicable to all payments made under agreements entered into before January 1, 1976. Sec. 1.166-9(f), Income Tax Regs. No explanation appears in legislative history for the failure to include a capital contribution provision in section 1.166-8, Income Tax Regs.↩
5. Mann v. Commissioner, T.C. Memo. 1975-74; Haslam v. Commissioner, T.C. Memo. 1974-97↩.
6. Petitioner made payments of both principal and interest on the promissory notes. The interest portion of payments made pursuant to guarantees entered into after December 31, 1975, is not deductible under section 163. Sec. 1.166-9(a) and (b), Income Tax Regs. However, the treatment of the interest portion of payments made as guarantors pursuant to agreements entered into prior to 1976 is not settled. The Eleventh Circuit, to which this case is appealable, has not considered whether the interest portion of such payments is deductible under the provisions of section 163. Other circuits are divided on the issue. See, e.g., Stratmore v. Commissioner, 785 F.2d 419 (3d Cir. 1986); Byram v. United States, 705 F.2d 1418 (5th Cir. 1983); Golder v. Commissioner, 604 F.2d 34↩ (9th Cir. 1979). This case is not an appropriate vehicle in which to consider section 163 because the parties did not place a section 163 deduction in issue.